**RECORD NO. 21-13476-JJ**

## In The
## United States Court of Appeals
## For The Eleventh Circuit

# COREY J. ZINMAN,

*Plaintiff – Appellant*,

**v.**

# NOVA SOUTHEASTERN UNIVERSITY, et al.,

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF FLORIDA**

_____

**CORRECTED APPELLANT'S INITIAL BRIEF**

_____

*Corey J. Zinman*
*E-Mail: cb2770@mynsu.nova.edu*
*175 Sedona Way,*
*Palm Beach Gardens, FL 33418*
*Telephone: (561) 566-9253*

*Pro Se Plaintiff*

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

**CASE NO. 21-13476-JJ**

COREY J. ZINMAN

Plaintiff - Appellant,

v.

NOVA SOUTHEASTERN UNIVERSITY, SOUTH FLORIDA STADIUM, LLC,
BROWARD COUNTY, BERTHA HENRY, MIAMI-DADE COUNTY,

Defendants - Appellees,

On Appeal From the
United States District Court
For the Southern District of Florida

_____

**APPELLANT'S CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Appellant Zinman (hereinafter "Appellant"), pursuant to Rule 26.1 of the
Federal Rules of Appellate Procedure and 11th Circuit Rule 26.1-1, hereby files
this Certificate of Interested Persons and Corporate Disclosure Statement, and
certifies that the following persons or entities have an interest in the outcome of
this appeal, listed in alphabetical order with descriptions:

1. Bean, Benjamin, Counsel for Defendant-Appellee Nova Southeastern
   University and Counsel for Defendant-Appellee South Florida Stadium,
   LLC.

C-1 of 3

2. Beauchamp, Richard, Counsel for Defendant-Appellee Nova Southeastern University and Counsel for Defendant-Appellee South Florida Stadium, LLC.

3. Broward County Office of the County Attorney, Counsel to Defendants-Appellees Broward County and Bertha Henry.

4. Henry, Bertha, Defendant-Appellee.

5. Jarone, Joseph, Counsel for Defendants-Appellees Broward County and Bertha Henry.

6. Katzman, Adam, Counsel for Defendants-Appellees Broward County and Bertha Henry.

7. McIntosh, Kristen, Counsel for Defendants-Appellees Broward County and Bertha Henry.

8. Meyers, Andrew J., Counsel for Defendants-Appellees Broward County and Berth Henry.

9. Morse, Lauren, Counsel for Defendant-Appellee Miami-Dade County.

10. Murray, David, Counsel for Defendant-Appellee Miami-Dade County.

11. Nova Southeastern University, Defendant-Appellee

12. Ruiz, Rodolfo, A., II, The Honorable District Judge, U.S. District Court for the South District of Florida.

13. South Florida Stadium, LLC, Defendant – Appellee.

14. Straus, Jared M., The Honorable Magistrate Judge, U.S. District Court for the Southern District of Florida.

15. Zinman, Corey, S. *pro se* Plaintiff - Appellant.

Appellant hereby certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Respectfully submitted,

*Corey J. Zinman*

Corey J. Zinman
E-Mail: cb2770@mynsu.nova.edu
175 Sedona Way,
Palm Beach Gardens, FL 33418
Telephone: (561) 566-9253

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Rule 28-1(c) of the Eleventh Circuit Rules. Oral argument is warranted in this case because it presents several issues of first impression in this Circuit; namely: 1) whether Title II requires places of public accommodation to refrain from imposing policies which require patrons to perform acts at odds with the fundamental tenets of their religion, or in the alternative, whether places of public accommodation must accommodate patrons whose sincerely held religious beliefs conflict with such policies; 2) whether Title II plaintiffs must comply with 42 U.S.C. § 2000a-3 if notifying the requisite state or local authorities and waiting 30 days would only delay their ability to obtain immediate relief; and 3) whether discrimination against Jewish individuals may give rise to a violation of Title VI.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................................................ i

TABLE OF AUTHORITIES .............................................................................................................. iii

TABLE OF RECORD REFERENCES IN THE BRIEF ......................................................................... ix

STATEMENT OF JURISDICTION ...................................................................................................... 1

ARGUMENT ..................................................................................................................................... 1

I.  COUNT I – TITLE II OF THE CIVIL RIGHTS ACT OF 1964 ...................................... 1

    A.  FAILURE TO COMPLY WITH TITLE II'S NOTICE PROVISION DOES NOT WARRANT DISMISSAL. ...................................... 1

    B.  CONGRESS DIDN'T INTEND FOR ACTIONS SEEKING PRELIMINARY RELIEF TO BE DISMISSED IN SITUATIONS WHERE PLAINTIFFS FAILED TO NOTIFY THE REQUISITE AUTHORITY PRIOR TO INSTITUTING SUIT WHEN NOTIFYING THE AUTHORITY AND WAITING 30 DAYS WOULD ONLY DELAY THEIR ABILITY TO OBTAIN IMMEDIATE RELIEF. ......................................... 4

    C.  ROBINSON'S HOLDING IS FULLY CONSISTENT WITH THE TEXT OF § 2000A-3(C). ......................................... 7

    D.  JUST AS COURTS SHOULD NOT COMPEL BUSINESSES TO SERVE A KOSHER MENU OR TO HOST GOLF TOURNAMENTS ON DAYS OTHER THAN SUNDAY, NEITHER SHOULD PLACES OF PUBLIC ACCOMMODATION COMPEL MEMBERS OF THE PUBLIC TO TAKE ACTION AT ODDS WITH THEIR SINCERELY HELD RELIGIOUS BELIEFS. ......................................... 8

II.  COUNT II – TITLE VI OF THE CRA ........................................................................ 10

III.  COUNTS III & IV – 42 U.S.C. § 1983 ....................................................................... 14

    A.  ZINMAN HAS THE REQUISITE STANDING TO STATE A CLAIM FOR DAMAGES AGAINST MIAMI-DADE COUNTY ............ 14

    B.  ZINMAN'S REQUESTS FOR DECLARATORY AND INJUNCTIVE RELIEF AREN'T MOOT BECAUSE HE REMAINS UNDER A CONSTANT THREAT OF BEING SUBJECTED TO ARBITRARY AND INHERENTLY DISCRIMINATORY MASK MANDATES. ............. 16

    C.  THE COUNTIES' ACTIONS ARE VIOLATIVE OF NUMEROUS RIGHTS GUARANTEED UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES. ......................................... 18

        1.  *Free Exercise* ......................................... 18

        2.  *Free Speech & Expression* ......................................... 22

        3.  *Assembly & Association* ......................................... 30

        4.  *Substantive Due Process* ......................................... 31

            a)  Bodily Integrity ......................................... 31

            b)  Freedom of Movement ......................................... 32

            c)  Freedom of Speech ......................................... 35

    D.  QUALIFIED IMMUNITY ......................................... 36

        1.  *Defendant Henry isn't entitled to qualified immunity because her actions exceeded the scope of her discretionary authority.* ......................................... 37

        2.  *Defendant Henry isn't entitled to qualified immunity because her actions violate numerous clearly established rights.* ......................................... 38

IV.  MOTION FOR SANCTIONS ......................................................................................... 40

CONCLUSION ............................................................................................................................... 44

CERTIFICATE OF COMPLIANCE ................................................................................................... 45

CERTIFICATE OF FILING AND SERVICE ...................................................................................... 45

# <u>TABLE OF AUTHORITIES</u>

**<u>Caselaw:</u>**

*Akiyama v. U.S. Judo Inc.*,
  181 F. Supp. 2d 1179 (W.D. Wash. 2002) …………………………………………….. 9

*Antietam Battlefield KOA v. Hogan*,
  461 F. Supp. 3d 214 (D. Md. 2020) ……………………………………… 23, 24, 25

*Ashcroft v. al–Kidd*,
  563 U.S. 731 (2011) ………………………………………………………… 38

*Board of Education v. Barnette*,
  319 U.S. 624 (1943) ………………………………………………………... 26

*Boyle v. Jerome Country Club*,
  883 F. Supp. 1422 (D. Idaho 1995) ……………………………………… 8, 9, 10

*Bush v. Schiavo*,
  885 So. 2d 321 (Fla. 2004) ………………………………………………... 37

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ……………………………………………………… 19, 20

*Crosslin v. Mountain States Tel. Tel. Co.*,
  400 U.S. 1004 (1971) ……………………………………………………... 3

*Cruzan v. Dir., Mo. Dep't of Health*,
  497 U.S. 261 (1990) ……………………………………………………… 31

*Espinoza v. Farah Mfg. Co.*,
  414 U.S. 86 (1973) ……………………………………………………… 12

*Fabick v. Evers*,
  2020AP1718-OA, 2021 WI 28 (Mar. 31, 2021) …………………………………….. 37

*Firestone v. Firestone*,
  76 F. 3d 1205 (D.C. Cir. 1996) …………………………………………… 3

*Fort Bend Cnty., Tex. v. Davis*,
  139 S. Ct. 1843 (2019) …………………………………………………… 2

## Caselaw:

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) …………………………………………………………... 30

*Hamer v. Neighborhood Housing Servs. of Chicago*,
    138 S.Ct. 13 (2017) ………………………………………………………………….. 2

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ………………………………………………………………… 36

*Jones v. Fransen*,
    857 F.3d 843 (11th Cir. 2017) ……………………………………………………….. 37

*Jordan v. Doe*,
    38 F.3d 1559 (11th Cir. 1994) ……………………………………………………….. 37

*Keeton v. Anderson-Wiley*,
    664 F.3d 865 (11th Cir. 2011) ……………………………………………….. 19, 20

*Kentner v. City of Sanibel*,
    750 F.3d 1274 (11th Cir. 2014) ……………………………………………………. 34, 35

*Laroche v. Denny's, Inc.*,
    62 F. Supp. 2d 1375 (S.D. Fla. 1999) ……………………………………………… 14

*Loftus v. Clark-Moore*,
    690 F.3d 1200 (11th Cir. 2012) ……………………………………………………. 38

*Love v. Pullman Co.*,
    404 U.S. 522 (1972) ………………………………………………………………… 2

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ……………………………………………………... 32, 33, 35, 39

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981) ……………………………………………………................... 35

*Minnesota Voters All. v. Walz*,
    492 F. Supp. 3d 822 (D. Minn. 2020),
    appeal dismissed, No. 20-3072, 2020 WL 9211131 (8th Cir. Nov. 9, 2020) ………. 28

**<u>Caselaw:</u>**

*Microtel, Inc. v. Fla. Public Serv. Comm'n*,
    464 So. 2d 1189 (Fla. 1985) …………………………………………........ 37

*Oakes v. Collier Cnty.*,
515 F. Supp. 3d 1202 (M.D. Fla. 2021) *Microtel, Inc. v. Fla. Public Serv. Comm'n*,
    464 So. 2d 1189 (Fla. 1985) ……………………………………………… 21, 30

*Oscar Mayer Co. v. Evans*,
441 U.S. 750 (1979) *Microtel, Inc. v. Fla. Public Serv. Comm'n*,
    464 So. 2d 1189 (Fla. 1985) …………………………………………………. 2

*Pierce v. Winograd*,
757 F.2d 714 (5th Cir. 1985) *Microtel, Inc. v. Fla. Public Serv. Comm'n*,
    464 So. 2d 1189 (Fla. 1985) …………………………………………........ 42

*Reno v. Flores*,
507 U.S. 292, 302 (1993) *Microtel, Inc. v. Fla. Public Serv. Comm'n*,
    464 So. 2d 1189 (Fla. 1985) …………………………………………..…. 32, 35

*Robinson v. Power Pizza, Inc.*,
993 F. Supp. 1458 (M.D. Fla. 1998) *Microtel, Inc. v. Fla. Public Serv. Comm'n*,
    464 So. 2d 1189 (Fla. 1985) …………………………………………………. 4

*Robinson v. Power Pizza, Inc.*,
    993 F. Supp. 1462 (M.D. Fla. 1998) …………………………………………… 6, 7

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) …………………………………………………... 16, 17, 18

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.* ("FAIR"),
    547 U.S. 47 (2006) ………………………………………………… 22, 23, 24

*Saint Francis Coll. v. Al-Khazraji*,
    481 U.S. 604 (1987) …………………………………………………... 10

*Schenck v. Pro-Choice Network Of W. New York*,
    519 U.S. 357 (1997) …………………………………………... 33, 35, 36, 39

**<u>Caselaw:</u>**

*Scottsdale Ins. Co. v. Flowers*,
    513 F.3d 546 (6th Cir. 2008) ……………………………………………… 42

*Shaare Tefila Congregation v. Cobb*,
    481 U.S. 615 (1987) ………………………………………………... 10

*Sheely v. MRI Radiology Network, P.A.*,
    505 F.3d 1173 (11th Cir. 2007) ……………………………………… 16, 17

*Sims v. State*,
    754 So. 2d 657 (Fla. 2000) ………………………………………………... 37

*Stearnes v. Baur's Opera House, Inc.*,
    3 F.3d 1142 (7th Cir. 1993) ………………………………………….. 1, 2

*Strober v. Payless Rental Car*,
    701 F. App'x 911 (11th Cir. 2017) …………………………………… 40, 42

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ………………………………………………... 14

*Texas v. Johnson*,
    491 U.S. 397 (1989) ………………………………………………... 23

*Union Pacific Railway Co. v. Botsford*,
    141 U.S. 250 (1891) ………………………………………………... 31, 39

*United States v. Concentrated Phosphate Export Assn.*,
    393 U.S. 199 (1968) ………………………………………………... 16

*United States v. Virginia*,
    518 U.S. 515 (1996) ………………………………………………… 31

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ………………………………………………… 30

*Washington v. Harper*,
    494 U.S. 210 (1990) ………………………………………………… 31

**Caselaw:**

*Wisconsin v. Yoder*,
　　406 U.S. 205 (1972) …………………………………………... 18, 19, 20, 21, 39

*Wooley v. Maynard*,
　　430 U.S. 705 (1977) …………………………………………... 26, 27, 39

**Statutes:**

42 U.S.C. § 1983 …………………………………………………………... 14

42 U.S.C. § 2000a–3(c) …………………………………………………... 1, 2, 3, 4, 7, 8

42 U.S.C. § 2000a–6(a) …………………………………………………... 1, 2

§ 252.32, Fla. Stat. …………………………………………………… 27, 35, 37

**Executive Orders:**

*Combating Anti-Semitism*,
　　Exec. Order No. 13899 of Dec. 11, 2019 …………………………………... 13

*Invalidating All Remaining Local Emergency Orders Based on the COVID-19 Emergency*,
　　State of Florida, Office of the Governor, Executive Order 21-101 of May 3, 2021 .. 15

*Suspending All Remaining Local Government Mandates and Restrictions Based on the COVID-19 State of Emergency*,
　　State of Florida, Office of the Governor, Executive Order 21-102 of May 3, 2021 .. 15

**Other:**

Akhil Reed Amar,
　　*AMERICA'S CONSTITUTION: A BIOGRAPHY* 362 (2005) ………………………… 11

Ashley Montagu,
　　*Man's Most Dangerous Myth: The Fallacy of Race* 38 (1964) ……………………. 13

Babiuk LA, Lawman MJ, Ohmann HB,
    *Viral-bacterial synergistic interaction in respiratory disease*,
        ADV. VIRUS RES., 35:219-49 (1988) ……………………………………… 22

David M. Morens, Jefery K. Taubenberger, Anthony S. Fauci,
    *Predominant Role of Bacterial Pneumonia as a Cause of Death in Pandemic
    Influenza: Implications for Pandemic Infuenza Preparedness*,
        J. INFECT. DIS., Vol. 198(7):962-970 (Oct. 2008) ………………………… 22

Kenneth L. Marcus,
    *Anti-Zionism as Racism: Campus Anti-Semitism and the Civil Rights Act of 1964*,
        15 Wm. & Mary Bill Rts. J. 837, 865 (2007),
        https://scholarship.law.wm.edu/wmborj/vol15/ iss3/4 ……………………… 11

Miguel Angel Royo-Bordonada, et al,
    Face *masks in the general healthy population. Scientific and ethical issues*,
        GAC. SANIT., S0213-9111(20)30199-0, (Sept. 2020) …………………….... 28

Pipat Luksamijarulkul, Natkitta Aiempradit, Pisit Vatanasomboon,
    *Microbial Contamination on Used Surgical Masks among Hospital Personnel and
    Microbial Air Quality in their Working Wards: A Hospital in Bangkok*,
        OMAN MED. J. Vol. 29(5) (2014) ………………………………………… 22

Sampson, V., Kamona, N. & Sampson, A.,
     *Could there be a link between oral hygiene and the severity of SARS-CoV-2
    infections?*,
        BR DENT J 228, 971–975 (June 2020),
        https://doi.org/10.1038/s41415-020-1747-8 ………………………………… 22

Sept. 2, 2021, *Order*, in *Scott et al. v. DeSantis et al.* (available at
https://www.scribd.com/document/522901724/DeSantis-Mask-Case-Order) …………… 15

WORLD HEALTH ORGANIZATION,
    *Clinical management of COVID-19: interim guidance*, (June 5, 2020) …………… 28

## STATEMENT OF JURISDICTION

The district court issued a final judgment affirming and adopting the magistrate judge's report and recommendation [R-81], granting Appellees' respective Motions to Dismiss [R-43 and R-44], denying Plaintiff's Motion for Sanctions [R-42], dismissing Plaintiff's requests for injunctive and declaratory relief without prejudice on mootness grounds, dismissing Plaintiff's Count IV without prejudice on mootness and standing grounds, and dismissing the remainder of Plaintiff's claims for damages on the merits. R-86. Plaintiff-Appellant, Corey J. Zinman ("Zinman"), filed a timely Notice of Appeal on October 12, 2021. R-91. This Honorable Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## ARGUMENT

## I.    COUNT I – TITLE II OF THE CIVIL RIGHTS ACT OF 1964

### A.    Failure to comply with Title II's notice provision does not warrant dismissal.

In *Stearnes v. Baur's Opera House, Inc.*, 3 F.3d 1142 (7th Cir. 1993) the Seventh Circuit rejected the contention that the provisions of § 2000a-6(a) permit an action to be brought under Title II where the plaintiff fails to comply with § 2000a-3(c). *Id.* at 1145. In doing so, the court reasoned that § 2000a-3(c) "requires that no action shall be brought under that particular section of [the Civil Rights Act of 1964] before the expiration of thirty days after notice of such alleged discriminatory act has been given the appropriate state agency; whereas § 2000a-6(a) simply provides that one who, for example, has given notice to the appropriate state agency need not thereafter exhaust such remedy before the district court acquires jurisdiction."

*Id.* Thus, the court ultimately concluded that "failure to notify the appropriate state agency when one exists dooms a Title II plaintiff's case." *Id.*

Notably, although Judge Strauss rejected the holding of *Stearnes* by finding that "Title II's notice provision, like Title VII's charge-filing requirement, 'is not of jurisdictional cast,'" R-81 at 10 (quoting *Fort Bend Cnty., Tex. v. Davis*, 139 S. Ct. 1843 (2019)), he nevertheless adopted its interpretation of § 2000a-3(c) and § 2000a-6(a) to conclude that compliance with Title II's notice provision is "mandatory." *Id.* Towards that end, Judge Strauss relied upon the Supreme Court's recent decision in *Davis* wherein the Court "stressed the distinction between jurisdictional prescriptions and nonjurisdictional claim-processing rules, which 'seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times,'" *Davis*, 139 S. Ct. at 1849 (quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)). R-81 at 10. Importantly, however, although the Court acknowledged that "[a] claim-processing rule *may be* 'mandatory,'" *Davis*, 139 S. Ct. at 1849 (emphasis added), in a separate footnote it noted that "[t]he Court has "reserved whether mandatory claim-processing rules may [ever] be subject to equitable exceptions," *id.* at 1849, n.5 (quoting *Hamer v. Neighborhood Housing Servs. of Chicago*, 138 S.Ct. 13, 18, n. 3 (2017)). Furthermore, it's well established that failure to comply with Title VII's charge-filing requirement is not a proper basis for dismissal. *Oscar Mayer Co. v. Evans*, 441 U.S. 750, 765 n.13 (1979). Rather, "[s]uspension of proceedings is preferable to dismissal." *Id.* "To require a second `filing' by the aggrieved party after termination of state proceedings would serve no purpose other than the creation of an additional procedural technicality." *Love v. Pullman Co.*,

404 U.S. 522, 526-527 (1972). "Such technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." *Id.* For this reason, suspension pending deferral is the preferred practice in the federal courts. *Crosslin v. Mountain States Tel. Tel. Co.*, 400 U.S. 1004 (1971) (judgment of dismissal for want of jurisdiction arising from failure to defer vacated; case remanded for consideration of stay pending deferral). Moreover, in compliance with § 2000a-3(c), Zinman did in fact provide the FCHR with notice regarding the discriminatory nature of mask mandates at least 30 days prior to commencing this action, albeit in a complaint filed against L.A. Fitness on December 16, 2020. However, by the time that Zinman was prepared to commence this action several months later, the FCHR had yet to take any action with respect to that complaint, or to otherwise acknowledge it at all. Accordingly, Zinman had no reason to believe that filing an additional complaint with the FCHR would've been anything but a futile exercise. Notwithstanding, even if Zinman was required to provide the FCHR with notice in a separate complaint filed against Appellees, the standard for dismissing a complaint with prejudice is extremely high: "dismissal *with prejudice* is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Firestone v. Firestone*, 76 F. 3d 1205, 1209 (D.C. Cir. 1996). As such, failure to comply with § 2000a-3(c) is not a proper basis for dismissal, especially not with prejudice, because such a failure can easily be cured given an opportunity to do so. In fact, § 2000a-3(c) explicitly contemplates "that the court may stay proceedings in such civil action." 42 U.S.C.

§ 2000a-3(c). Thus, it was error for Judge Strauss to recommend dismissal of Zinman's Title II claims because he allegedly failed to comply with § 2000a–3(c).

**B. Congress didn't intend for actions seeking preliminary relief to be dismissed in situations where plaintiffs failed to notify the requisite authority prior to instituting suit when notifying the authority and waiting 30 days would only delay their ability to obtain immediate relief.**

As Judge Strauss correctly noted, "whether Plaintiff was required to comply with [Title II's thirty-day notice] provision … turns on the availability of state or local administrative remedies." R-81 at 11. However, he erroneously concluded that "such remedies were available," and therefore "Plaintiff's compliance was required." *Id.* Towards that end, Judge Strauss noted that "the Florida Civil Rights Act ["FCRA"] makes it impermissible to deny an individual access to a place of public accommodation based on religion," and further that "the Florida Commission on Human Relations ["FCHR"] is charged with investigating complaints made pursuant to the [FCRA]." *Id.* Importantly, however, the fundamental flaw with that analysis is that it places undue emphasis upon the conduct prohibited by the FCRA as opposed to the remedies provided thereby. To be clear, whether Zinman was required to comply with Title II's thirty-day notice provision doesn't turn on whether FCRA prohibits religious discrimination in places of public accommodation; rather, it turns on whether the FCHR is empowered to grant the particular relief sought by Zinman (i.e., a preliminary injunction).

In *Robinson v. Power Pizza, Inc.*, 993 F. Supp. 1458 (M.D. Fla. 1998), the Middle District of Florida recognized an equitable exception to Title II's thirty-day notice provision. In doing so, it noted that "[i]t is clear that the Commission does not have the power to preliminarily enjoin the Defendant's alleged discriminatory conduct." *Id.* at 1460. As such,

4

the court concluded that complaints "should not be dismissed for failure the supply notice to the [FCHR]." *Id.* ("This Court does not believe that Congress intended actions seeking preliminary relief to be dismissed in situations where Plaintiffs — for whatever reason — failed to notify the requisite State or local authority prior to instituting suit when notifying the State authority and waiting thirty days would only delay Plaintiffs' ability to obtain immediate relief").

Given that Zinman sought a temporary restraining order and/or a preliminary injunction allowing him to attend the commencement ceremony unmasked and otherwise prohibiting Appellees from discriminating against him as well as those similarly situated to him, and because the FCHR isn't authorized to temporarily enjoin Appellees' discriminatory behavior, Zinman wasn't required to notify the FCHR prior to commencing this action. Additionally, under the FCRA's procedure, Appellees would've had up to twenty-five days to answer Zinman's complaint—a delay that would've been harmful to Zinman because the Commission doesn't have the power to act prior to the filing of an answer or lapsing of the period allowed for doing so. *See* Fla. Stat. § 760.11(1). As such, separate and apart from the FCHR's inability to preliminarily enjoin Appellees, the Commission could've taken no action toward the resolution of Zinman's claim—aside from serving the complaint upon Appellees—during the thirty days set aside by Congress. Accordingly, compliance with Title II's thirty-day notice provision would've been a fruitless and wasteful exercise. To be sure, Zinman did in fact file two separate complaints against NSU and SFS with the FCHR on September 3, 2021, however, the FCHR has failed to respond to or to otherwise acknowledge either complaint as

of the date of this filing.

Nevertheless, in addressing Zinman's argument that he wasn't required to notify the FCHR prior to commencing this action because he sought preliminary injunctive relief and acted with urgency in doing so, Judge Strauss opined that *Robinson* is distinguishable from the instant case because "Plaintiff has failed to demonstrate any 'unique concerns of urgency.'" R-81 at 12. Towards that end, Judge Strauss noted that "Nova notified students as early as January 2021 that masks would be required at the commencement ceremony … [y]et, Plaintiff did not file this case and his motion for a preliminary injunction until April 2021." *Id.* Thus, Judge Strauss concluded that "even if this Court were to agree with the holding in *Robinson*, Plaintiff evidently failed to act with any sense of urgency." *Id.* at 13. Notably, however, although NSU notified students that masks would be required at the commencement ceremony on January 22, 2021, R-87 at 4, it didn't confirm that an in-person ceremony would be held until February 16, 2021, R-88 at 4. Furthermore, in *Robinson*, the plaintiffs didn't serve their motion for an injunction upon the defendant in that case until January 13, 1998, nearly 3 months after the alleged Title II violation began occurring on or about October 17, 1997. *Robinson v. Power Pizza, Inc.*, 993 F. Supp. 1462, 1463 (M.D. Fla. 1998). Conversely, in the case at bar, Zinman filed and served his Motion upon Appellees on or about April 7, 2021, approximately six weeks after learning that he wouldn't be permitted to attend the commencement ceremony without being compelled to sacrifice his sincerely held religious beliefs. R-6 at 4. Accordingly, even though he's proceeding pro se and was a full-time student at the time, Zinman still managed to act with greater urgency than the licensed attorneys who

represented the plaintiffs in *Robinson*. Moreover, the purportedly "unique concerns of urgency" which confronted the court in *Robinson* were regarding a pizza parlor's refusal to provide delivery service to a predominantly African American neighborhood based upon an arbitrary determination that deliveries to homes in that area posed a security risk to its employees, even though it offered delivery service to residents of the neighborhood at established "drop off" locations. *Robinson*, 993 F. Supp. at 1463. Surely it cannot seriously be held that a neighborhood's desire to have pizzas delivered directly to their homes somehow presents a more compelling sense of urgency than Zinman's desire to attend his law school commencement ceremony without being forced to sacrifice his religious beliefs.

## C. *Robinson*'s holding is fully consistent with the text of § 2000a-3(c).

Not surprisingly, the one and only precedent that Judge Strauss expressed misgivings about was the Middle District of Florida's decision in *Robinson*, which, according to Judge Strauss, "seems to be at odds with the text of § 2000a-3(c)." R-81 at 12, n. 10. Towards that end, he stated that "the court in *Robinson* recognized that 'Congress *clearly contemplated* that actions seeking preliminary relief would be brought under section 2000a-3(a) *and that the thirty day notice requirement would apply to such actions*,'" and further that "[w]hile the court proceeded to state that 'the statute is silent as to whether the agency must be one that can provide the Plaintiff with the particular relief sought,' … such silence does not justify writing words into the statute that Congress did not include." *Id.* Moreover, Judge Strauss also noted that "the statute does not merely refer to a state or local law establishing or authorizing a state or local authority to grant relief from a discriminatory practice, it refers to a state or local law

7

'establishing or authorizing a State or local authority to grant *or seek* relief from such practice.'" *Id.* Importantly, however, the portion of the statute emphasized by Judge Strauss speaks not to the ability of private individuals to seek relief from a discriminatory practice, but rather to the ability of "a state or local authority to grant or seek relief from such practice." § 2000a-3(c). As previously noted, the FCHR is without power to issue temporary restraining orders or preliminary injunctions. Thus, contrary to Judge Strauss's erroneous assertion, *Robinson*'s holding is fully consistent with 42 U.S.C. § 2000a-3(c).

### D. Just as courts should not compel businesses to serve a kosher menu or to host golf tournaments on days other than Sunday, neither should places of public accommodation compel members of the public to take action at odds with their sincerely held religious beliefs.

In recommending dismissal of Zinman's Title II claims, Judge Strauss reiterated the district court's flawed reasoning set forth in denying Zinman's motion for preliminary injunctive relief by stating that "Plaintiff does not allege that he is being denied entry to Nova or South Florida Stadium's property *because of his religion*," and further that although "Plaintiff … alleges that Nova and South Florida Stadium have denied him an *accommodation* of his purported religious beliefs in violation of Title II … Plaintiff has not pointed to any authority indicating that Title II requires public facilities to *accommodate* religious beliefs and practices." R-81 at 13, n. 11 (citing *Boyle v. Jerome Country Club*, 883 F. Supp. 1422, 1432 (D. Idaho 1995)). As an initial matter, however, that analysis mischaracterizes the nature of Zinman's claims against NSU and SFS. To be clear, although he wasn't required to make such an allegation in the first place, Zinman's SAC clearly alleged that Appellees "intentionally

8

discriminated against Zinman *on the basis of his religion* as well as the racial group to which he belongs by denying him the full and equal enjoyment of its goods, services, facilities, privileges, advantages, and accommodations unless he agreed to sacrifice his sincerely held religious beliefs by symbolizing his faith in and subservience to so-called 'experts' who claim to be able to save lives if people simply obey their commands without question—otherwise known as false idols." R-38 at 102. Accordingly, the notion that Zinman somehow failed to allege that he was denied entry to Appellees' property "*because of his religion*" is objectively erroneous.

More importantly, although the District of Idaho has held that "to affirmatively accommodate patrons' religious beliefs in a recreational golf tournament setting is not appropriate nor allowed under the applicable legislation," notably, it only did so after finding that the establishment in that case "*never refused to permit Plaintiff to enter* a tournament or to play a round of golf." *Boyle*, 883 F. Supp. at 1425 (emphasis added). Similarly, in *Akiyama*, the court held that "[a]bsent more, the fact that a proprietor has decided to offer his or her services to the public in a way which could impact a religious practice or belief, whether it be by conducting business only on Sundays, by failing to keep a Kosher kitchen, by failing to include fish on the menu during Lent, or by prohibiting smoking, raises no inference of discrimination or other conduct which Congress sought to censure through the enactment of Title II." *Akiyama v. U.S. Judo Inc.*, 181 F. Supp. 2d 1179, 1185 (W.D. Wash. 2002). However, neither of the aforementioned cases stand for the proposition that Title II never requires establishments to accommodate religious beliefs and practices; rather, they stand for

the proposition that courts will not compel establishments to take affirmative action to accommodate religious beliefs and practices with respect to otherwise *neutral and generally applicable* business decisions (e.g., conducting golf tournaments only on Sundays, not serving a Kosher menu, or prohibiting smoking). Ironically, however, such reasoning tends to support Zinman's position. To be clear, just as courts should not compel businesses to serve a kosher menu or to host golf tournaments on days other than Sunday, neither should places of public accommodation compel members of the public to take action at odds with their sincerely held religious beliefs. Moreover, the fundamental distinction between *Boyle* and the case at bar is that, here, Appellees didn't merely fail to accommodate Zinman's religious beliefs or practices; rather, they affirmatively denied Zinman the full and equal enjoyment of their goods, services, facilities, privileges, advantages, and accommodations. R-38 at 102.

## II.    COUNT II – TITLE VI OF THE CRA

The Supreme Court has unanimously decided that Arabs and Jews are protected against racial discrimination. *See*, e.g., *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604 (1987); *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987). In doing so, the Court noted that "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Id.* at 613.

Although the debates on the 1964 Civil Rights Act provide little legislative history with respect to issues of ethnic and religious discrimination, one point is, however, abundantly clear: Congress intended to prohibit racial discrimination in federally funded programs to the

10

same extent as the prohibition contained in the Thirteenth and Fourteenth Amendments.[1] The broad language of Section One of the Fourteenth Amendment was widely understood by its framers to encompass the commands of the 1866 Civil Rights Act.[2] In other words, just as the 1964 Act incorporates the full scope of the Fourteenth Amendment's prohibition on racial discrimination, the Fourteenth Amendment in turn prohibits racial discrimination at least to the full extent covered under the 1866 Act. To be sure, one of the principal motivating factors leading to the framing of the Fourteenth Amendment was a congressional desire "to provide an incontrovertible constitutional foundation" for the 1866 Act.[3] In short, a consistent refrain among members of the 39th Congress was that a constitutional amendment was necessary to strengthen the support for the 1866 Act, either because the Act was not sufficiently supported by the existing Constitution or because others might later claim that it was unconstitutional.[4] It is clear, then, that Congress's enactment of Section One of the Fourteenth Amendment was intended, in significant measure, to provide firmer constitutional protection for the rights defined in the 1866 Act.[5] As such, the scope of its protections couldn't be narrower than the scope of the statutory provisions which rest upon it.[6] The constitutional basis for the 1866 Act must therefore provide protections against racial discrimination that are at least as broad as those contained in the 1866 Act, and those broad protections are therefore incorporated into

---

1.     Kenneth L. Marcus, *Anti-Zionism as Racism: Campus Anti-Semitism and the Civil Rights Act of 1964*, 15 Wm. & Mary Bill Rts. J. 837, 865 (2007), https://scholarship.law.wm.edu/wmborj/vol15/ iss3/4.
2.     *Id.* at 868.
3.     Akhil Reed Amar, *AMERICA'S CONSTITUTION: A BIOGRAPHY* 362 (2005).
4.     *See* Marcus, *supra* note 1, at 871.
5.     *Id.* at 872.
6.     *Id.*

the 1964 Act as well.[7]

In *Espinoza*, the Supreme Court set forth standards for defining "national origin." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973). According to the Court, "[t]he term 'national origin' on its face refers to the country where a person was born, *or*, more broadly, *the country from which his or her ancestors came*." *Id.* at 87–88 (emphasis added). Notably, despite their differences, Jews and Christians ultimately agree that We're the Descendants of Abraham who made a covenant with God in which God promised to bless Abraham and his Descendants and to make of them a great *Nation*. As such, one cannot identify as either Jewish or Christian without referring to the national origin of their ancestors.

In response to Zinman's argument that "Jewish ethnicity, nationhood, and religion are inextricably interrelated, as Judaism is the ethnic religion of the Jewish nation," R-38 at 44, Judge Strauss suggested that "[e]ven if this Court were to assume that one's race or national origin can be 'Jewish' for purposes of a Title VI claim, Plaintiff fails to include factual allegations to show that Nova's mask mandate was discriminatory from a racial or national origin perspective … because Plaintiff implies that the issue with the mask mandate is that compliance with it is tantamount to worshiping false idols, and that it is impermissible for Jewish people to worship idols … [which] pertains to a religious belief, not a racial characteristic," R-81 at 15. As an initial matter, however, there's no such thing as a "racial characteristic." To be clear, the concept of race is entirely a social construction which has historically been used to justify the exploitation of certain groups of people and is not

---

7.      *Id.*

indicative of any significant biological differences between such groups.[8] Furthermore, if this Court were to adopt Judge Strauss's reasoning, then by extension of the same logic, a policy which prohibits the wearing of headgear wouldn't impermissibly discriminate against Jews or Muslims because the idea that Jews must wear kippot or that Muslims must wear hijabs pertains to a religious belief, and not a so-called "racial characteristic." Moreover, such an interpretation is clearly at odds with a recent Executive Order issued by President Trump wherein he declared that "individuals who face discrimination on the basis of race, color, or national origin do not lose protection under Title VI for also being a member of a group that shares common religious practices."[9]

Additionally, Judge Strauss suggested that "[i]f the Court were to accept Plaintiff's argument, then one who discriminates against a Jewish person would automatically be liable for discrimination based on race, religion, and national origin, without any regard to what the nature of the discriminatory act was." *Id.* According to Judge Strauss, "[s]uch a broad and overgeneralized position … is untenable." *Id.* However, it's unclear why Judge Strauss appears to be so tolerant of discrimination against Jews in the first place, irrespective of "the nature of the discriminatory act." Notwithstanding, even if discrimination against Jews did give rise to a Title VI claim based on race, religion, and national origin, that wouldn't automatically triple the liability against those who engage in such discriminatory acts; rather, they'd only be liable for their discriminatory act(s), regardless of whether that act is

---

8.    Ashley Montagu, *Man's Most Dangerous Myth: The Fallacy of Race* 38 (1964) ("It was only among peoples who had themselves for centuries been emancipated from serfdom and slavery, but who themselves kept slaves, that the hereditary or biological conception of race differences was developed").

9.    *Combating Anti-Semitism*, Exec. Order No. 13899 of Dec. 11, 2019.

13

characterized as discrimination based on race, religion, or national origin.

Lastly, according to Judge Strauss, "the SAC does not contain any factual allegations to show that Nova's mask mandate was implemented to intentionally discriminate against any race, color, or national origin, nor that it disproportionately impacts any race, color, or national origin." R-81 at 14. As an initial matter, however, it's well established that "plaintiff[s] need not set forth allegations of a prima facie case in the complaint." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) ("a complaint in a[] … discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination"). Moreover, "[d]iscrimination is often simply masked in subtle forms, and it is always easier to assume a less odious intention to what is in reality discriminatory behavior." *Laroche v. Denny's, Inc.*, 62 F. Supp. 2d 1375, 1384 (S.D. Fla. 1999) ("courts must be vigilant to insure that a plaintiff has the ability to prove discrimination, even if circumstantially"). As such, Zinman must be allowed an opportunity to prove discrimination, even if circumstantially.

## III.    COUNTS III & IV – 42 U.S.C. § 1983

### A. <u>Zinman has the requisite standing to state a claim for damages against Miami-Dade County.</u>

According to Judge Strauss "Plaintiff has standing to seek damages against Broward (and Palm Beach) but not Dade." R-81 at 20. Towards that end, he concluded that "due to a recent executive order signed by … Governor DeSantis … which "eliminate[d] and supersede[d] any existing emergency order or ordinance issued by a county or municipality that imposes restrictions or mandates upon businesses or individuals due to the COVID-19 emergency … Plaintiff's requests for declaratory and injunctive relief in Counts III and IV

14

(and V) are not premised upon a live case or controversy and should be dismissed." *Id.* at 19. Importantly, however, the Second Judicial Circuit in and for Leon County recently held that "an executive order and/or agency action, such as a blanket ban of a face mask policy … does not meet constitutional muster because such action violates the separation of powers doctrine."[10] Consequently, Executive Orders 2021-101[11] and 2021-102[12] are unconstitutional for that same reason.

Additionally, as Judge Strauss aptly noted, "[s]imply because the mask mandates are no longer in place does not mean any claims for damages that became ripe prior to Governor DeSantis's Executive Order were mooted out by the Executive Order." R-81 at 19. Furthermore, as Judge Strauss also noted, based upon … local ordinances due to the COVID-19 pandemic, [NSU] … informed students that they would be required to wear face masks at graduation … at the Hard Rock Stadium (located in Dade), which [SFS] operates." *Id.* at 2. Thus, according to Judge Strauss's own logic, Zinman has the requisite standing to state a claim for damages against Miami-Dade County for planting the seed which ultimately led to NSU and SFS's decision to require masks at the commencement ceremony irrespective of the fact that the County's mask mandate was technically no longer in effect on the day of the commencement.

---

10. Sept. 2, 2021, *Order*, in *Scott et al. v. DeSantis et al.* (available at https://www.scribd.com/document/522901724/DeSantis-Mask-Case-Order).
11. *Invalidating All Remaining Local Emergency Orders Based on the COVID-19 Emergency*, State of Florida, Office of the Governor, Executive Order 21-101 of May 3, 2021 (hereinafter *Executive Order 21-101*).
12. *Suspending All Remaining Local Government Mandates and Restrictions Based on the COVID-19 State of Emergency*, State of Florida, Office of the Governor, Executive Order 21-102 of May 3, 2021 (hereinafter *Executive Order 21-102*).

**B. Zinman's requests for declaratory and injunctive relief aren't moot because he remains under a constant threat of being subjected to arbitrary and inherently discriminatory mask mandates.**

The Supreme Court has established a stringent standard for determining whether a case has been mooted by a defendant's voluntary conduct: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968). In determining whether a case has been mooted by a cessation of challenged conduct, the Eleventh Circuit has recognized the following three factors to be especially relevant: (1) whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice; (2) whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart; and (3) whether, in ceasing the conduct, the defendant has acknowledged liability. *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184 (11th Cir. 2007).

In *Roman Cath. Diocese of Brooklyn*, petitioners sought relief from an Executive Order issued by the Governor of New York which imposed severe restrictions on attendance at religious services in areas classified as "red" or "orange" zones. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 63–66 (2020). The dissenting opinions argued that injunctive relief should've been withheld because, after the applicants had petitioned the Court for relief, the Governor had reclassified the areas in question. *Id.* at 68. However, according to the majority:

> There is no justification for that proposed course of action. It is clear that this matter is not moot. And injunctive relief is still called for because the applicants remain under a

16

constant threat that the area in question will be reclassified as red or orange.

*Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 68 (internal citations omitted).

As was the case in *Roman Cath. Diocese of Brooklyn*, in the instant case, Zinman sought relief from various emergency orders, however, prior to the pendency of this matter, Governor DeSantis issued Executive Orders invalidating existing "emergency order[s] issued by a political subdivision due to the COVID-19 emergency which restricts the rights or liberties of individuals or businesses"[13] and which *temporarily suspended* "all local COVID-19 restrictions and mandates on individuals and businesses."[14] On that basis, Judge Strauss concluded that "Plaintiff's requests for declaratory and injunctive relief in Counts III and IV (and V) are not premised upon a live case or controversy and should be dismissed." R-81 at 19. As an initial matter, however, Appellees' conduct was part of a continuing and deliberate practice, their cessation of such practice was motivated purely by the aforementioned Executive Orders as opposed to a genuine change of heart, and, in temporarily ceasing such conduct, rather than acknowledge liability for the unconstitutionality of their actions, the Appellee Counties have shamelessly defended them. Accordingly, the factors recognized by this Court in *Sheely* clearly suggest that Zinman's requests for declaratory and injunctive relief aren't moot and that injunctive relief is still called for because Zinman, as well as those similarly situated to him, remain under a constant threat of once again being subjected to arbitrary and inherently discriminatory mask mandates. *Sheely*, 505 F.3d at 1184; *Roman*

---

13.    *Executive Order 21-101*, *supra*, note 9.
14.    *Executive Order 21-102*, *supra*, note 10.

17

*Cath. Diocese of Brooklyn*, 141 S. Ct. at 68. In fact, Broward County, Miami-Dade County, and Palm Beach County have already implemented various mask mandates in defiance of Governor DeSantis.[15] Thus, there's no justification for Judge Strauss's proposed course of action to dismiss Zinman's claims for injunctive and declaratory relief as moot.

## C. The Counties' actions are violative of numerous rights guaranteed under the Constitution and laws of the United States.

### 1. Free Exercise

In *Wisconsin v. Yoder*, the Supreme Court of the United States struck down a compulsory school-attendance law on the ground that it "affirmatively compel[led] … [Amish people], under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Wisconsin v. Yoder*, 406 U.S. 205, 218-220 (1972). Furthermore, the *Yoder* Court explicitly recognized that, "to agree that religiously grounded conduct must often be subject to the broad police power of the State is not to deny that *there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability*." *Id.* (emphasis added). Moreover, the Court also noted that compulsory school-attendance for Amish children "carries with it *precisely the kind of objective danger that the*

---

15.    *See, e.g.,* Jay O'Brien, *Inside Palm Beach County's decision to defy the state and mandate masks* (Aug. 20, 2021), https://cbs12.com/news/local/inside-palm-beach-countys-decision-to-defy-the-state-and-mandate-masks; Adriana Gomez Licon, Mike Schneider, *Florida mayors defy DeSantis with mask, vaccine mandates* (July 28, 2021), https://apnews.com/article/health-miami-coronavirus-pandemic-247f603722fc0f1d38d0bd97a9006c25; Tyler O'Neil, *Broward school board becomes latest to defy DeSantis by imposing mask mandate in schools* (Aug. 11, 2021), https://www.fox13news.com/news/broward-school-board-becomes-latest-to-defy-desantis-by-imposing-mask-mandate-in-schools; Andre Atterbury, *Miami, Tampa schools defy DeSantis on masks despite threats* (Aug. 18, 2021), https://www.politico.com/states/florida/story/2021/08/18/miami-tampa-schools-defy-desantis-on-masks-despite-threats-1390193.

*First Amendment was designed to prevent*" by forcing such children to "either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region." *Id.* at 218 (emphasis added).

Like the compulsory school-attendance law at issue in *Yoder*, mask mandates constitute a substantial burden upon fundamental First Amendment freedoms by effectively forcing individuals to choose between complying with the fundamental tenets of their religion, only to face potential legal repercussions for doing so, or complying with the affirmative commands of those who claim to be able to spare lives if people simply obey them without question (i.e., false idols). Accordingly, to pass constitutional muster, mask mandates must satisfy strict scrutiny and be narrowly tailored toward a compelling government interest. Nevertheless, in support of the notion that mask mandates should only be subject to rational basis review, Judge Strauss concluded that such "mandates are neutral and generally applicable." R-81 at 23. Towards that end, he opined that such mandates "are neutral because they do not have the object of 'infring[ing] upon or restrict[ing] practices because of their religious motivation.'" *Id.* (citing *Keeton v. Anderson-Wiley*, 664 F.3d 865, 879 (11th Cir. 2011)) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)). Notably, however, the compulsory school-attendance law at issue in *Yoder* did not have the object of infringing upon or restricting religious practices; nevertheless, the Supreme Court explicitly recognized that "a facially neutral regulation may nonetheless offend the constitutional requirement for governmental neutrality in its application if it unduly burdens the free exercise of religion." *Yoder*, 406 U.S. at 220. As such, irrespective of whether the

19

challenged emergency orders had the object of infringing upon or restricting religious practices, they nevertheless offend the constitutional requirement for government neutrality because their application unduly burdens the free exercise of religion. To be clear, like the compulsory school-attendance law at issue in *Yoder*, mask mandates present the kind of objective danger that the First Amendment was designed to prevent by forcing God-fearing individuals to either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region. *Id.* at 218. Moreover, "[n]eutrality and general applicability are interrelated, and … failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531-32. Thus, given that the challenged emergency orders offend the constitutional requirement for governmental neutrality, they necessarily offend the requirement for general applicability as well.

Additionally, Judge Strauss concluded that challenged emergency orders are generally applicable because the government has not "in a selective manner impose[d] burdens only on conduct motivated by religious belief." R-81 at 23 (citing *Keeton*, 664 F.3d at 879) (quoting *Church of the Lukumi Babalu Aye*, 508 U.S. at 543). Significantly, however, in *Keeton*, the Eleventh Circuit held that a university's curricular requirement that students *refrain* from violating the American Counseling Association's (ACA) Code of Ethics was a *neutral* regulation of general application. *Id.* at 869. Accordingly, *Keeton* is immediately distinguishable from the facts of the instant case because a university's requirement that students refrain from violating an applicable code of ethics is a *negative commandment,*

whereas mask mandates are *affirmative* in nature. Consequently, the instant case is more similar to *Yoder* wherein the Supreme Court struck down a compulsory school-attendance law which affirmatively compelled Amish people to perform acts at odds with the fundamental tenets of their religion because it was not neutral even though the law at issue was one of general applicability. *Yoder*, 406 U.S. at 218-220.

Lastly, according to Judge Strauss, "Plaintiff has not shown, and cannot plausibly allege, that the mask mandates are not rationally related to a legitimate government interest." R-81 at 24. Towards that end, although Judge Strauss correctly noted that "Plaintiff does not dispute that the counties have a legitimate interest in stemming the spread of COVID-19," he completely disregarded Zinman's claim that implicit in the counties' assertion that mask mandates are rationally related to that interest is "the erroneous assumption that masks somehow serve to promote that end, rather than contribute to the further loss of human lives and other harsh consequences produced by COVID-19." *Id.* Furthermore, Judge Strauss noted that although Plaintiff "may disagree with the public health efficacy of mask orders … federal courts do not sit in a policy-checking capacity to second guess the wisdom of state legislative acts." *Id.* (citing *Oakes v. Collier Cnty.*, 515 F. Supp. 3d 1202 (M.D. Fla. 2021)). Towards that end, he stated that "it is certainly rational for Defendants to believe, based on the guidance provided by the CDC and other experts, that mask mandates will help control the spread of COVID-19." *Id.* As an initial matter, however, the challenged emergency orders are not legislative acts but rather executive orders. Additionally, even assuming that masks do act as a "barrier" to help prevent respiratory droplets from spreading as Appellees contend, they

must likewise serve as a "barrier" to prevent bacteria which tend to thrive in moist mucus-soaked environments (e.g., the inside of a facemask) from escaping as well.[16] This is particularly concerning because inhalation of bacteria directly into the lungs of patients incubating respiratory viruses risks synergistic interaction which can cause a rapid deterioration in the patient's condition, commonly resulting in death.[17] Compounding matters further, according to Dr. Victoria Soraya Sampson, among others:

> It is clear that bacterial superinfections are common in patients suffering from a severe case of COVID-19, with more than 50% of deaths exhibiting bacterial superinfections. Furthermore, it is common for respiratory viruses to predispose patients to bacterial superinfections, as seen in the influenza outbreaks in 1918 and 2009. Over 80% of patients in ICU exhibited an exceptionally high bacterial load, and treatment has been successful with a dual regime of an antiviral and an antibiotic.[18]

Thus, in contrast to Judge Strauss's baseless and conclusory assertion that "mask mandates/policies are rationally related to a legitimate government interest," *id.*, mandating the wearing of facial coverings promotes "bacterial superinfections" and therefore fails to promote the public's health, safety, or welfare.

### 2. Free Speech & Expression

In *FAIR*, the Third Circuit concluded that the regulation at issue unconstitutionally compelled schools to accommodate the military's message "[b]y requiring schools to include

---

16. Pipat Luksamijarulkul, Natkitta Aiempradit, Pisit Vatanasomboon, *Microbial Contamination on Used Surgical Masks among Hospital Personnel and Microbial Air Quality in their Working Wards: A Hospital in Bangkok*, OMAN MED. J. Vol. 29(5) (2014).

17. *See*, e.g., Babiuk LA, Lawman MJ, Ohmann HB, *Viral-bacterial synergistic interaction in respiratory disease*, ADV. VIRUS RES., 35:219-49 (1988); David M. Morens, Jeffery K. Taubenberger, Anthony S. Fauci, *Predominant Role of Bacterial Pneumonia as a Cause of Death in Pandemic Influenza: Implications for Pandemic Infuenza Preparedness*, J. INFECT. DIS., Vol. 198(7):962-970 (Oct. 2008).

18. Sampson, V., Kamona, N. & Sampson, A., *Could there be a link between oral hygiene and the severity of SARS-CoV-2 infections?*, BR DENT J 228, 971–975 (June 2020), https://doi.org/10.1038/s41415-020-1747-8.

military recruiters in the interviews and recruiting receptions the schools arrange." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.* ("FAIR"), 547 U.S. 47, 63 (2006). Notably, however, the compelled-speech violation in each of the Court's prior cases resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate. *Id.* Accordingly, the Supreme Court reversed the decision of the Third Circuit. *Id.* In doing so, it noted that:

> In this case, accommodating the military's message does not affect the law schools' speech, because the schools are not speaking when they host interviews and recruiting receptions. Unlike a parade organizer's choice of parade contingents, a law school's decision to allow recruiters on campus is not inherently expressive. Law schools facilitate recruiting to assist their students in obtaining jobs. *A law school's recruiting services lack the expressive quality of a parade, a newsletter, or the editorial page of a newspaper; its accommodation of a military recruiter's message is not compelled speech because the accommodation does not sufficiently interfere with any message of the school.*

*Id.* at 64 (emphasis added).

Although Judge Strauss correctly noted that "Plaintiff … argue[s] that requiring him to wear a mask compels him to engage in expressive conduct conveying a message of subservience to authority and that the refusal to wear a mask is inherently expressive of his disapproval of that message and the mask mandates themselves," he erroneously concluded that "wearing a mask does not evince an intent to send a message of subservience to authority – or any message at all." R-81 at 26. Towards that end, Judge Strauss relied upon the District Court of Maryland's decision in *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214 (D. Md. 2020). R-81 at 26. Importantly, however, in that case, the court erroneously interpreted the Supreme Court's holding in *FAIR* and *Texas v. Johnson*, 491 U.S. 397, 418 (1989).

23

*Antietam Battlefield KOA*, 461 F. Supp. 3d at 236. To be clear, the fundamental distinction between the expressive conduct that was protected by the Court in *Johnson* (i.e., burning the American flag) and that which was denied protection by the Court in *FAIR* (i.e., refusing to allow military recruiters upon college campuses) was that, in *FAIR*, the regulation at issue "neither limit[ed] what law schools may say nor require[d] them to say anything," *FAIR*, 547 U.S. at 60, whereas in *Johnson*, the regulation at issue categorically prohibited flag burning, whether as a form of political protest or otherwise, *Johnson*, 491 U.S. at 418. Like the law at issue in *Johnson*, mask mandates prohibit being unmasked in public, whether as a form of political protest or otherwise. Accordingly, the court in *Antietam Battlefield KOA* erred by likening mask mandates to the regulation at issue in *FAIR* which did "not dictate the content of the speech at all," *see FAIR*, 547 U.S. at 62, as opposed to the law at issue in *Johnson* which did in fact limit the allowable content of speech by effectively prohibiting flag burning as a form of political protest.

Contrary to refusing to allow military recruiters upon a college campus, refusing to wear a mask in defiance of government mandates manifests the expressive quality of a parade, a newsletter, or the editorial page of a newspaper. Indeed, as Judge Strauss even conceded, "[t]here are myriad reasons why someone may not be wearing mask – the person … may be attempting to send a political or religious message as Plaintiff contends." R-81 at 26. Nevertheless, Judge Strauss concluded that "Plaintiff's argument that the challenged mask mandates limit his ability to protest mask mandates by requiring him to wear a mask does not make his desire to not wear a mask inherently expressive conduct within the ambit of First

24

Amendment protection." *Id.* at 27. Notably, however, in *Johnson*, the Court recognized that not all action taken with respect to our flag is constitutionally protected. *Johnson*, 491 U.S. at 405. Rather, in characterizing flag burning for First Amendment purposes, the Court "considered the context in which it occurred." *Id.* Accordingly, the Court's holding in *Johnson* wasn't premised upon the notion that flag burning is inherently expressive in all contexts; rather, it was premised upon the fact that "Johnson burned an American flag as part … of a political demonstration." *Id.* at 406. While Zinman hasn't been prosecuted for staging a political demonstration in defiance of local mask mandates, according to the plain language of the challenged emergency orders, he was effectively prohibited from doing so without subjecting himself to potential criminal liability. Accordingly, this Court should reject the flawed reasoning of *Antietam Battlefield KOA* and instead apply the Supreme Court's holding in *Johnson* to declare that the challenged emergency orders are unconstitutionally overbroad prohibitions of expressive conduct.

Additionally, according to Judge Strauss, "Plaintiff's argument that requiring him to wear a face mask is tantamount to forcing him to 'adopt the government's message' … is unavailing." R-81 at 27, n. 15. Towards that end, Judge Strauss contends that "[r]equiring someone to wear a mask is no more 'compelling speech' in favor of mask wearing than requiring people to pay taxes is 'compelling speech' in favor of the Tax Code." *Id.* Notably, however, the Tax Code is immediately distinguishable from the challenged emergency orders given that nobody is mandated to pay their taxes in public. Furthermore, in *Barnette*, the Supreme Court struck down a statute which required public school students to participate in

daily public ceremonies honoring the flag both with words and traditional salute gestures. *Board of Education v. Barnette*, 319 U.S. 624, 636 (1943). Similarly, in *Maynard*, the Court applied its earlier holding in *Barnette* to strike down a statute which "in effect required that individuals use their private property as a 'mobile billboard' for the State's ideological message or suffer a penalty." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) ("As a condition to driving an automobile a virtual necessity for most Americans the Maynards must display 'Live Free or Die' to hundreds of people each day"). Although the Court recognized that "[c]ompelling the affirmative act of a flag salute involved a more serious infringement upon personal liberties than the passive act of carrying the state motto on a license plate," it nevertheless held that "the difference is essentially one of degree." *Id.* According to the Court:

> Here, as in *Barnette*, we are faced with a state measure which forces an individual, as part of his daily life indeed constantly while his automobile is in public view to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable. In doing so, the State "invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control."

*Maynard*, 430 U.S. at 715 (quoting *Barnette*, 319 U.S. at 642). Thus, if compelling individuals to wear masks were truly akin to requiring them to obey the Tax Code, then the same could've also been said about compelling students to salute the flag or forcing drivers to display the motto "Live Free or Die" upon their license plates.

Like the law at issue in *Maynard*, the challenged emergency orders compel individuals such as Zinman and those similarly situated to him to be "an instrument for fostering public adherence to an ideological point of view" in which they find unacceptable. Consequently, in

26

doing so, the Defendant Counties "invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment … to reserve from all official control." *Maynard*, 430 U.S. at 715 (quoting *Barnette*, 319 U.S. at 642). Notwithstanding, according to Judge Strauss, "even if the Court were to consider mask-wearing inherently expressive, the Defendants are correct that intermediate scrutiny would apply and that the mask mandates contained in the Emergency Orders satisfy such scrutiny." R-81 at 28. Towards that end, Judge Strauss contends that "[t]here is no dispute here that the Counties had the power to issue the Emergency Orders at issue." *Id.* at 29. Importantly, however, Zinman has maintained from the outset of this action that the Defendant Counties were without constitutional power to issue the challenged emergency orders. R-7 at 12 (§ 252.32, Fla. Stat. "is unconstitutionally vague because it impermissibly delegates extensive legislative authority to non-elected officials in the absence of minimal standards or guidelines ascertainable by reference to the enactment" in violation of the non-delegation doctrine"); *id.* at 31 ("mask mandates are violative of the constitutionally guaranteed right to have the legislative power of the state vested in a legislature of the State of Florida").

Additionally, according to Judge Strauss, although "Plaintiff … contest[s], with conclusory allegations and vague references to scientific studies unrelated to COVID-19, the efficacy of masks as a means of preventing the spread of COVID-19 … [such] allegations are insufficient to plausibly maintain that the challenged Emergency Orders fail to further the Counties' important interest, particularly when nearly every public health institution in the country has recommended mask-wearing as a means of slowing the virus's spread." R-81 at

27

29. Towards that end, Judge Strauss cites to *Minnesota Voters All. v. Walz*, 492 F. Supp. 3d

822 (D. Minn. 2020), appeal dismissed, No. 20-3072, 2020 WL 9211131 (8th Cir. Nov. 9,

2020), wherein the District of Minnesota held that "there is no question that [mask mandates]

further[] the substantial government interest in controlling the spread of a deadly and highly

contagious disease." *Id.* at 838. Notably, however, while the *Minnesota Voters* court

emphasized that "federal health officials recommend face coverings as an effective way to

slow the spread of COVID-19," and also concluded that "this recommendation finds support

in recent studies," it nevertheless failed to reference any such studies. *Id.* Furthermore, in stark

contrast to that baseless assertion, according to an interim guidance report published by the

World Health Organization on June 5, 2020, "there is no direct evidence (*from studies on*

*COVID-19* and in healthy people in the community) on the effectiveness of universal masking

of healthy people in the community to prevent infection with respiratory viruses, *including*

*COVID-19.*"[19] Moreover, as noted in Zinman's Response in Opposition to Appellees', NSU's

and SFS's, Motion to Dismiss, "the nation's foremost infectious disease expert['s] … emails

… were recently obtained through Freedom of Information Act requests and published by the

BuzzFeed News and the Washington Post on June 1, 2021." R-59 at 3. Notably, on February

4, 2020, Ms. Sylvia Burwell emailed Dr. Fauci the following question:

> I am travelling … Folks are suggesting I take a mask for the airport. Is this something
> I should do[?]

---

19.     *See*, e.g., WORLD HEALTH ORGANIZATION, *Clinical management of COVID-19: interim guidance*, (June
        5, 2020); Miguel Angel Royo-Bordonada, et al, Face *masks in the general healthy population. Scientific and
        ethical issues*, GAC. SANIT., S0213-9111(20)30199-0, (Sept. 2020).

28

R-59-1 at 5. In response, on February 5, 2020, Dr. Fauci replied that "[m]asks are really for infected people to prevent them from spreading infection to people who are not infected rather than protecting uninfected people from acquiring infection," and further that "[t]he typical mask you buy in the drug store is not really effective in keeping out virus, which is *small enough to pass through the material*." *Id.* at 4 (emphasis added). Additionally, on April 15, 2020, Ray DuBois, Dean of Medicine at the Medical University of South Carolina, emailed Dr. Fauci the following question.

> Currently, we have a "voluntary" mask wearing policy for the health system and our main University Hospital. Based on your recent comments about asymptomatic and pre-symptomatic carriers of COVID-19, do you agree that keeping this voluntary is the correct approach?

R-59-2 at 4. In response, on April 16, 2020, Dr. Fauci replied that he "would keep the policy '*voluntary*' but would '*encourage*' employees to wear them." *Id.* (emphasis added). Lastly, and perhaps most importantly, on April 14, 2020, the Office of the Surgeon General emailed Dr. Fauci the following question: "Are masks and gloves truly effective, if so, why are so many medical professionals contracting the virus?" R-59-3 at 5-6. In response, on April 21, 2020, Dr. Fauci replied that "in cases where inadequate PPE is worn, or if it is not put on/taken off according to proper procedure, *the risk of contracting COVID is increased*." *Id.* at 4 (emphasis added). Significantly, this advice is fully consistent with Zinman's claim that "[f]acial coverings serve as a highly effective medium for bacterial pathogens which tend to thrive in moist mucus-soaked environments, such as the inside of a facemask," and that "[i]nhalation of bacteria directly into the lungs of a patient incubating [SARS-CoV-2] risks

synergistic interaction which can cause a rapid deterioration in the patient's condition, commonly resulting in death. R-38 at ¶ 51, 53. Consequently, not only do Appellees' respective mask mandates fail to adhere to Dr. Fauci's recommendation to implement mask policies on a voluntary basis, but they also tend to put the public at greater risk than it otherwise would've faced due to the outbreak of SARS-CoV-2.

### 3. Assembly & Association

In response to Zinman's claim that "the challenged mask mandates violate [his] rights to peacefully assemble and freely associate … by "effectively prohibit[ing] individuals from gathering unmasked," Judge Strauss stated that "[t]his claim is a head scratcher." R-81 at 31 (quoting *Oakes*, 515 F. Supp. 3d at 1215). Towards that end, he contends that "mask mandates do nothing to prevent Plaintiff from assembling or associating with others; they simply require that he be masked while doing so," and further that "mask mandates seem to have, at most, a minimal impact … on Plaintiff's rights to assemble and associate." *Id.* Moreover, according to Judge Strauss, "to the extent the mask mandates could be interpreted as placing any burden on Plaintiff's rights of assembly and association, at most they would amount to 'time, place, and manner' restrictions subject to the same intermediate scrutiny described above." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). However, a complete ban on gatherings for the purpose of protesting the government for redress of grievances related to mask mandates can hardly be described as minimally burdensome. Nevertheless, even assuming *arguendo* that Judge Strauss were correct that mask mandates must only satisfy intermediate scrutiny, this burden "is demanding and it rests entirely on the State." *Glenn v.*

*Brumby*, 663 F.3d 1312, 1321 (11th Cir. 2011) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)) ("The defendant's burden cannot be met by relying on a justification that is 'hypothesized or invented post hoc in response to litigation'"). Although protecting the public health is undoubtedly a compelling government interest, the Counties haven't adduced any evidence whatsoever to show that mask mandates serve to promote public health, let alone that they're somehow narrowly tailored toward that end.

### 4. Substantive Due Process

#### a) Bodily Integrity

According to Judge Strauss, "[a] mask requirement does not plausibly qualify as a "compulsory bodily intrusion." R-81 at 33. Towards that end, Judge Strauss contends that "[w]earing a mask on the outer surface of one's face to cover one's nose and mouth does not 'intrude' within one's body." *Id.* at 34. Notably, however, while mask mandates may be "different in kind and degree" from the compulsory bodily intrusions at issue in *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250 (1891), *Washington v. Harper*, 494 U.S. 210 (1990), and *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990), there's no authority to support the notion that individuals only possess a fundamental liberty interest in the interior of their own bodies. Rather, in *Union Pacific Railway Co.*, the Supreme Court explicitly recognized that "*no right is held more sacred*, or is more carefully guarded, by the common law, t*han the right of every individual to the possession and control of his own person*, free from *all* restraint or interference of others, *unless by clear and unquestionable authority of law*," and further that the right "to be let alone" was not merely a liberty interest to be balanced against

governmental interests but rather a "*complete immunity*." 141 U.S. at 251 (emphasis added). Thus, mask mandates constitute compulsory bodily intrusions for which no overriding justification exists and infringe upon the rights to bodily integrity and self-determination without due process of law. Accordingly, to pass constitutional muster, mask mandates must be justified by a compelling government interest and be narrowly tailored to achieve that interest. *Reno v. Flores*, 507 U.S. 292, 302 (1993).

### b) *Freedom of Movement*

In *Madsen*, a Florida state court issued a permanent injunction enjoining specified organizations and individuals from, among other things, "congregating, picketing, patrolling, demonstrating or entering that portion of public right-of-way or private property within [36] feet of the property line of the Clinic"; and from approaching anyone "seeking the services of the Clinic" who is within 300 feet of the clinic, unless the person "indicates a desire to communicate." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 762–764 (1994). Upon review, after determining that the injunction was content neutral, *id.*, at 762–764, the Supreme Court noted that the proper test for evaluating such injunctions under the First Amendment was "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest," *id.*, at 765. Towards that end, the Court held that some of the injunction's provisions burdened more speech than necessary to serve these interests, but that others did not. *Id.* Namely, it struck down the 300–foot no-approach zone around the clinic, stating that it was difficult "to justify a prohibition on all uninvited approaches ... regardless of how peaceful the contact may be ... [a]bsent evidence that the

protesters' speech is independently proscribable (i.e., 'fighting words' or threats), or is so infused with violence as to be indistinguishable from a threat of physical harm." *Id.* Similarly, in *Schenck*, the Court applied *Madsen* to strike down certain provisions of an injunction imposing "floating buffer zones around people entering and leaving [abortion] clinics because they burden more speech than is necessary to serve the relevant governmental interests." *Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357, 377 (1997). According to the Court, "[t]he floating buffer zones prevent defendants … from communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks." *Id.* Although the Court didn't "decide whether … governmental interests … ever justify some sort of zone of separation between individuals … measured by the distance between the two," the Court ultimately held that "because this broad prohibition on speech 'floats,' it cannot be sustained." *Id.*

While *Madsen* and *Schenck* were both decided upon free speech grounds, principles pertaining to freedom of movement were central to the Court's decisions in both cases as well. As the Court explained in *Schenck*:

> Since the buffer zone floats, protesters on the public sidewalks who wish (i) to communicate their message to an incoming or outgoing patient or clinic employee and (ii) to remain as close as possible (while maintaining an acceptable conversational distance) to this individual, must move as the individual moves, maintaining 15 feet of separation.

*Schenck*, 519 U.S. at 377–78; *see also Madsen*, 512 U.S. at 775 ("the 300–foot zone would ban "general marching through residential neighborhoods, or even walking a route in front of an entire block of houses"). Consequently, free-floating buffer zones necessarily implicate the

33

fundamental right to freedom of movement because they require individuals to move according to the movements of others.

In response to Zinman's claim that the challenged emergency orders are unconstitutional "to the extent that [they] require all persons … to wear masks where social distancing of at least 6-feet is not possible because such a requirement effectively amounts to an impermissible and wholly arbitrary free-floating buffer zone," Judge Strauss contends that:

> There are at least a few issues with his argument. First, it is only the Broward Order that contains six-feet language. Second, the six-feet component is not arbitrary. It is common knowledge at this point that the CDC and other experts have recommended social distancing of at least six feet. In fact, Chapter 4 of the Broward CEO even explains that "Social Distancing means staying at least 6 feet away . . . in accordance with CDC Guidelines." In other words, the Broward CEO shows that Broward did not arbitrarily pull "six feet" out of thin air. Third, even if the six-feet component was arbitrary, Plaintiff fails to show how it is 'arbitrary in the constitutional sense.'

R-81 at 34. As an initial matter, however, although Zinman may have incorrectly implied that all of the challenged emergency orders at issue require individuals to wear masks where social distancing of at least 6-feet isn't possible, it's unclear why Broward County and Bertha Henry should be absolved of liability for unconstitutionally imposing free-floating buffer zones in violation of clearly established Supreme Court precedent. Furthermore, Judge Strauss relied upon the this Court's holding in *Kentner v. City of Sanibel*, 750 F.3d 1274 (11th Cir. 2014) to conclude that "under rational basis review, CDC guidelines are more than sufficient to justify the six-feet component of Broward's Order." R-81 at 34. Notably, however, in *Kentner*, rational basis review applied because the riparian rights at issue were "state-created rights, not fundamental rights." *Kentner*, 750 F.3d at 1280. Conversely, in the instant case, Zinman has

alleged violations of numerous fundamental rights, including the rights to freedom of movement and freedom of speech. R-38 at 83, 120. More importantly, when this Court stated that "governments 'are not required to convince the courts of the correctness of their legislative judgments,'" *Kentner*, 750 F.3d at 1280 (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981)), it did so within the context of a city's municipal ordinance amending its Land Development Code, something in which it was in fact constitutionally empowered to do. Conversely, as noted above, the statute in which the challenged emergency orders were enacted pursuant to (§ 252.32, Fla. Stat.) is unconstitutionally vague because it impermissibly delegates extensive legislative authority to non-elected officials in the absence of minimal standards or guidelines ascertainable by reference to the enactment in violation of the non-delegation doctrine. Accordingly, irrespective of the "correctness of their legislative judgements," Appellees are without constitutional power to make such judgements in the first place. Lastly, regardless of whether a 6-foot floating buffer zone is itself arbitrary, Broward County and Bertha Henry imposed such a buffer zone for an indefinite period subject only to their own capricious discretion. As such, their actions arbitrarily infringed upon the fundamental right to freedom of movement. Thus, to pass constitutional muster, such actions must be justified by a compelling government interest and must be narrowly tailored to achieve that interest. *Reno*, 507 U.S. at 302.

### c) *Freedom of Speech*

Like the injunctions at issue in *Madsen* and *Schenck*, the floating buffer zones imposed by Broward County's emergency order prevent Zinman and those similarly situated to him

from communicating a message critical of mask mandates from a normal conversational distance or handing leaflets conveying such a message to people walking on the public sidewalks unless of course they wear a mask which would effectively render that message utterly meaningless. However, if masks were truly such an effective means of preventing the spread of COVID-19, then individuals should be able to sufficiently protect themselves by wearing a mask regardless of whether others around them choose to do so. Accordingly, Broward County could've achieved its desired result by encouraging people to wear masks wherever social distancing of at least 6-feet isn't possible rather than mandating that all individuals do so. Thus, even if this Court were not inclined to declare the portion of Broward County's emergency order imposing a 6-foot floating buffer zone around every individual in Broward County unconstitutional on the ground that it infringes upon the fundamental right to freedom of movement, it should nevertheless declare that portion of the order to be unconstitutional on the ground that it burdens substantially more speech than necessary to serve the relevant governmental interests. *Schenck*, 519 U.S. at 377.

### D. Qualified Immunity

The doctrine of qualified immunity protects government actors performing discretionary functions from liability and suit for civil damages unless their conduct violates clearly established federal statutory or constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

**1. Defendant Henry isn't entitled to qualified immunity because her actions exceeded the scope of her discretionary authority.**

"To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority." *Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017). A public official acts within the scope of his discretionary authority when his actions "(1) [are] undertaken pursuant to the performance of his duties, and (2) [are] within the scope of his authority." *Id.* (quoting *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)).

As an initial matter, it's well settled that the legislature "may not delegate the power to enact a law or the right to exercise unrestricted discretion in applying the law." *See*, e.g., *Microtel, Inc. v. Fla. Public Serv. Comm'n*, 464 So. 2d 1189, 1191 (Fla. 1985); *Sims v. State*, 754 So. 2d 657, 668 (Fla. 2000). This prohibition, known as the nondelegation doctrine, requires that "fundamental and primary policy decisions … be made by members of the legislature who are elected to perform those tasks." *Bush v. Schiavo*, 885 So. 2d 321, 332 (Fla. 2004). Accordingly, it's clearly established that "our constitutional structure does not contemplate unilateral rule by executive decree … [but rather] consists of policy choices enacted into law by the legislature and carried out by the executive branch." *Fabick v. Evers*, 2020AP1718-OA, 2021 WI 28 (Mar. 31, 2021). Thus, although Defendant Henry acted under color of law in enacting Broward County Emergency Order 20-21, she nevertheless exceeded the scope of her discretionary authority by acting pursuant to § 252.32, Fla. Stat. which impermissibly delegates broad legislative authority to non-elected officials in the absence of

37

minimal standards or guidelines ascertainable by reference to the enactment. Consequently, Appellee Henry isn't entitled to invoke the protections of qualified immunity.

### 2. Defendant Henry isn't entitled to qualified immunity because her actions violate numerous clearly established rights.

According to Judge Strauss, "it is inconceivable that Henry could have violated any clearly established constitutional rights, based on materially similar binding precedent, by enacting or enforcing an emergency order aimed at a pandemic that this country and this world have never seen before." R-81 at 38. Towards that end, Judge Strauss states that "the fact that numerous courts – bound to follow the Supreme Court decisions cited in the SAC – have rejected challenges identical to Plaintiff's challenges …, whereas Plaintiff has failed to cite even a single decision in his favor, further highlights that no materially similar binding precedent clearly establishes the rights Plaintiff claims exist." *Id.* As such, Judge Strauss ultimately concluded that "Henry is entitled to qualified immunity." Notably, however, to show that the law was clearly established, the Supreme Court "do[es] not require a case directly on point." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). Rather, the dispositive question is "whether the violative nature of particular conduct is clearly established." *Fransen*, 857 F.3d at 851. Moreover, "a right is 'clearly established' when the defendant's conduct 'lies so obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'" *Id.* (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)).

It's beyond cavil that the Supreme Court has established that floating buffer zones are

unconstitutional and cannot be sustained. *See*, e.g., *Schenck*, 519 U.S. at 377–78; *Madsen*, 512 U.S. at 775. Additionally, in *Union Pacific Railway Co.*, the Court explicitly recognized that "*no right is held more sacred*, or is more carefully guarded, by the common law, t*han the right of every individual to the possession and control of his own person*, free from *all* restraint or interference of others, *unless by clear and unquestionable authority of law*," and further that the right "to be let alone" was not merely a liberty interest to be balanced against governmental interests but rather a "*complete immunity*." 141 U.S. at 251 (emphasis added). Consequently, it's clearly established by "materially similar" binding precedent that government actors are without power to arbitrarily burden the right of individuals to move freely or to infringe upon than the right of every individual to the possession and control of his or her own person.

Additionally, in *Yoder*, the Court explicitly recognized that "*there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability*." *Yoder*, 406 U.S. at 220 (emphasis added). Furthermore, in *Barnette* and *Maynard*, the Court struck down laws which "force[] an individual, as part of his daily life indeed constantly while … in public view to be an instrument for fostering public adherence to an ideological point of view." *See*, e.g., *Maynard*, 430 U.S. at 715; *Barnette*, 319 U.S. at 642. Accordingly, it's clearly established that the government may not "invade[] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Maynard*, 430 U.S. at 715. Moreover, this prohibition lies so obviously at the core of what the First Amendment was designed to prevent that it should've been abundantly clear to Appellee

Henry that she was without lawful authority to compel members of the public to perform acts at odds with the fundamental tenets of their religious beliefs or to force such individuals to foster public adherence to an ideological point of view.

## IV.    MOTION FOR SANCTIONS

On June 9, 2021, pursuant to Rule 11 of the Federal Rules of Civil Procedure, Zinman filed a Motion for Sanctions regarding submission of numerous false or misleading statements by Defendants' Attorneys Richard A. Beauchamp ("Beauchamp") and Benjamin P. Bean ("Bean"). R-42. Namely, Zinman took issue with the following false or misleading statements set forth in Appellees' Response and Opposition to Plaintiff's Motion for a Restraining Order and/or Preliminary Injunctive Relief [R-18] as well as Defendants' Motion to Dismiss Plaintiff's Amended Complaint [R-19]: 1) attorneys Beauchamp and Bean stated that in *Strober v. Payless Rental Car*, 701 F. App'x 911 (11th Cir. 2017), the Eleventh Circuit held that "plaintiff failed to state a claim under Title II because she did not exhaust her administrative remedies," R-18 at 14,  R-19 at 17; 2) attorneys Beauchamp and Bean asserted that Zinman "does not … allege that the mask requirements of the Commencement Defendants are motivated by discriminatory intent," R-18 at 16; 3) attorneys Beauchamp and Bean asserted Zinman "does not allege that he was denied access to any public accommodations within NSU's campus," R-18 at 13; and 4) attorneys Beauchamp and Bean accuse Zinman of failing "to identify an injury beyond his potential disappointment and embarrassment that will result from his lack of … participation at NSU's May 16, 2021, commencement ceremony," R-18 at 18. Regarding the first statement, while the *Strober* Court did observe that the plaintiff

had failed to exhaust her administrative remedies, nowhere in the Court's opinion was it ever stated that the plaintiff's failure to exhaust her administrative remedies was necessarily fatal to her title II claim; at best, it was a single factor which may have impacted the Court's decision had the plaintiff not abandoned her Title II claim on appeal. Additionally, regarding the second statement, a cursory review of Zinman's filings in this action reveal numerous allegations that Appellees' "pattern and practice of acts … constitute an intentional and outrageous deprivation of statutorily guaranteed civil rights." R-5 at 2, 57, 104, 112, 115; R-6 at 1, 8; R-7 at 10, 12, 18, 22, 23, 26, 28, 30, 31, 34, 36.  Similarly, regarding the third statement, Zinman's Amended Complaint clearly alleges that on "January 24, 2021, Zinman sent a letter to Dean Juárez Jr. … requesting that the University amend its campus guidelines to accommodate individuals for whom … mask wearing … conflicts with their sincerely held religious beliefs and/or practices," and further that on "January 26, 2021, Zinman received a letter from … Assistant Dean for Student Development Michelle Manley stating that: 'NSU is within its right to mandate that students, staff, and faculty as well as community members wear a mask while on university controlled property.'" R-5 at 28-29. Lastly, regarding the fourth statement, Zinman's Opening Brief in Support of his Motion for a Temporary Restraining Order and/or Preliminary Injunctive Relief clearly stated that he and "those similarly situated to him would suffer greatly if injunctive relief is not granted by being forced to choose between either sacrificing their religious beliefs or being excluded from participating in their own graduation ceremony, and otherwise subjected to a continuing pattern and practice of acts constituting an intentional and outrageous deprivation of civil

rights without adequate justification, and further that "in either scenario, Zinman and those similarly situated to him would be imminently and irreparably harmed due to the humiliation, frustration, embarrassment, as well as the overall insult to human dignity which is certain to result from being told that they are unacceptable on account of their sincerely held religious beliefs." R-7 at 35-36.

Nevertheless, with respect to the first statement—regarding *Strober*—Judge Strauss concluded that "defense counsel's statement is completely accurate, and Plaintiff's contention to the contrary is completely frivolous." R-81 at 44. Towards that end, Judge Strauss noted that "two days before Plaintiff filed his reply and memorandum, Judge Bloom entered an order in another case Plaintiff filed in this district, wherein Judge Bloom rejected essentially the same argument Plaintiff raises here." *Id.* According to Judge Strauss, "Plaintiff's decision to advance the argument, after both Judge Bloom and the Court in this case had given him indication that his claim was meritless … suggests bad faith and raises serious concerns regarding whether Plaintiff possesses the requisite character and fitness to become a member of the Florida Bar." *Id.* at 45. As an initial matter, however, a good faith test of a court's order implies no disrespect toward the court. *Pierce v. Winograd*, 757 F.2d 714, 716 (5th Cir. 1985). More importantly, Zinman had to advance the argument to properly preserve it for appeal. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) ("an argument not raised before the district court is waived on appeal"). Thus, Zinman's decision to challenge Judge Bloom's interpretation of *Strober* isn't suggestive of bad faith nor of his unfitness to be a member of the Bar; rather, it was fully "consistent with the highest standards of the legal

profession." *Pierce*, 757 F.2d at 716. As such, Judge Strauss's decision to impugn Zinman's fitness to practice law for merely challenging a judge's interpretation of an issue and attempting to preserve that issue for appeal is not only an egregious abuse of discretion, but also raises serious concerns about his own fitness to be a neutral and detached decisionmaker.

Regarding the second, third, and fourth statements, Judge Strauss concluded that "[t]hey are not clear misrepresentations of material facts as Plaintiff contends," and further that "[t]hey are facially – or, at a minimum, arguably – accurate statements regarding Plaintiff's Amended Complaint [R-5] which was the operative pleading at the time the statements were made." R-81 at 45. Additionally, according to Judge Strauss, "they concern largely trivial statements that should have been addressed in briefing (if at all) and not through a Rule 11 motion." *Id.* On that basis he suggests that "Plaintiff's Motion for Sanctions in this case appears to represent nothing more than an improper strong-arm tactic" and "should undoubtedly be denied." *Id.* at 46. Notably, however, although Judge Strauss concluded that the second, third, and fourth statements which Zinman complained of were "largely trivial," clearly attorneys Beauchamp and Bean believed them to be consequential enough to warrant dismissal of Zinman's complaint, as evidenced by their decision to include them in their Motion to Dismiss. Furthermore, in their Motion to Dismiss, Appellees, NSU and SFS, requested that the Court enter an Order "awarding [them] their attorney's fees and costs," R-44 at 21, however, Judge Strauss took no exception to Appellees' request. Consequently, according to Judge Strauss, it's perfectly acceptable for attorney's representing corporations generating millions in annual revenues to request that pro se plaintiffs compensate their clients

for expenses incurred responding to a purportedly frivolous complaint in an attempt to dissuade future plaintiffs from asserting such claims, however, it's an "improper strong-arm tactic" for pro se plaintiffs to request compensation for the value of their time wasted responding to what they in good faith believe to be a frivolous motion to dismiss. Nevertheless, there's no legitimate reason why attorneys Beauchamp and Bean should be permitted to seek dismissal of Zinman's complaint as well as compensation for having to respond to the same upon the basis of objectively false statements while Zinman is prohibited from seeking compensation for the value of his time wasted responding to such frivolous arguments; such a double standard is downright unconscionable and should therefore be rejected by this Court.

## CONCLUSION

Based upon the foregoing, Zinman respectfully requests that the district court's September 15th order dismissing this action be reversed and that this case be remanded for adjudication on the merits. Additionally, Zinman respectfully requests that the district court's July 14th protective order be vacated and that the district court be instructed to refrain from arbitrarily limiting Zinman's right to discovery of relevant evidence or from denying Zinman adequate, effective, and meaningful access to the courts in the future.

Respectfully submitted,

_Corey J. Zinman_

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), and the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font and contains exactly 12,994 words.

## **CERTIFICATE OF FILING AND SERVICE**

I HEREBY CERTIFY that, on January 3, 2022, I served a copy of the foregoing upon counsel for Defendants by filing the same via the Court's CM/ECF system, which shall cause the same to be electronically transmitted to: Benjamin Bean, Richard Beauchamp, Joseph Jarone, Adam Katzman, Kristen McIntosh, Andrew Meyers, and Lauren Morse.

*Corey J. Zinman*